**STATE of Missouri, Respondent,**

v.

**David BARNETT, Appellant.**

No. 79985.

Supreme Court of Missouri,
En Banc.

Nov. 24, 1998.

As Modified on Denial of Rehearing
Dec. 22, 1998.

William J. Swift, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for Respondent.

STEPHEN N. LIMBAUGH, Jr., Judge.

A St. Louis County jury convicted David Michael Barnett of two counts of first degree murder, one count of first degree robbery, and two counts of armed criminal action. Barnett was sentenced to death for each of the two murder counts and consecutive life sentences for the robbery and armed criminal action counts. This Court has jurisdiction of the appeal because the death sentence was imposed. Mo. Const. art. V, sec. 3. The judgment is affirmed.

## I.  FACTS

The following facts have been compiled from this Court's independent review of the evidence adduced at trial.[1] This Court reviews that evidence in the light most favorable to the verdict. *State v. Rousan*, 961 S.W.2d 831 (Mo. banc 1998).

During January and the first few days of February 1996, David Barnett had been living with friends in the Glendale area. He had spoken several times to his friends about his grandparent's car, a 1995 Dodge Intrepid, and had told them that his grandparents were going to rent this car to him. About 8:00 a.m. on Sunday, February 4, 1996, Barnett walked to the home of his grandparents, who were away attending Sunday school and church services at the Kirkwood Baptist church. Barnett entered the home, apparently through a bedroom window, sat down on the couch, turned on the television, and soon fell asleep. When he awoke, he phoned his stepbrother Scott and boasted that he had just won the lottery last night and had suddenly come into of a large sum of money.

Barnett was waiting for his grandparents when they returned home around 1:00 p.m. He confronted his grandmother and pushed her down in the hallway. He then pushed his grandfather to the floor and grabbed a knife that was lying on the nearby kitchen table. As his grandfather rose from the floor, Barnett kicked him in the head, and when he fell to the floor again, Barnett stabbed him repeatedly in the neck area. All told, Barnett inflicted ten stab wounds and numerous cuts to his grandfather's neck, face and hands. Satisfied that he had killed his grandfather, Barnett returned to the kitchen to get another knife and then began stabbing his grandmother in her neck as well. Once again, Barnett returned to the kitchen to get more knives. This time he retrieved two knives with which he continued to stab his grandmother until she, too, was killed. She suffered a total of 12 stab wounds to her neck and numerous cuts to her face.

After the attack, Barnett concealed one of the knives by placing it between two mattress pads in his grandparents' bedroom. Next, he went into the bathroom and washed the blood off his hands. He then removed the keys to the 1995 Dodge Intrepid that were dangling from the lock in the back door, retrieved his coat, and took approximately 120 dollars from his grandmother's purse. Before leaving the house, Barnett stood silently next to his victims to hear if they were still breathing. After determining that his victims were dead, Barnett lowered two of the shades in the house, locked up, and drove off in the victims' car.

Early the next morning, police officers found the victims' car parked in a residential area of Glendale. Barnett walked up to the uniformed officers and confessed that he had committed the murders.

## II.  VOIR DIRE

### 1. Gender *Batson*

■ Barnett claims that the trial court erred in overruling his objections to the state's peremptory removal of three female venirepersons in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128

---

1. The statement of facts in defendant's brief should comply with the provisions of Rule 84.04(c), which requires a "fair and concise statement of the facts relevant to the questions presented for determination without argument...." Barnett's statement of facts is more argumentative than fair and more confusing than concise. A fair statement of facts should begin with a recitation of the facts and circumstances of the crime for which defendant was tried and convicted, rather than a recitation of the mitigating factors upon which he relied unsuccessfully in the penalty phase of the trial.

L.Ed.2d 89 (1994). The Equal Protection Clause, as interpreted in *Batson*, prohibits the use of peremptory strikes to exclude jurors on the basis of race. *Batson v. Kentucky*, 476 U.S. at 97, 106 S.Ct. 1712. The *Batson* analysis was extended in *J.E.B.* to prohibit the use of gender-based strikes. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. at 146, 114 S.Ct. 1419.

Missouri has adopted a three-step procedure for a *Batson* challenge. First, the defendant must object to the state's peremptory strike by identifying the protected group to which the venireperson belongs. *State v. Nicklasson*, 967 S.W.2d 596, 613 (Mo. banc 1998). The state must then provide a reasonably specific, clear, race-neutral and/or gender-neutral explanation for the strike. *Id.* Once the state provides a legitimate explanation, the burden shifts to the defendant to show that the state's explanation was pretextual and that the strike was actually motivated by the venireperson's race or gender. *Id.* This Court will reverse the trial court's decision on *Batson* challenges only upon a showing of clear error. *Id.*

### a. Venireperson Straub

Barnett contends that venireperson Straub was improperly struck from the jury panel because the prosecutor admitted that the strike was motivated by the fact that Straub was a female. At trial, the prosecutor explained her action by stating:

> I struck this juror because, as I said previously, I'm concerned about having weak *people on this jury. I want people who I* feel comfortable with being able to not only consider the death penalty but actually be able to do it. This is a very young female who is single. And I believe that because of that circumstance that she *would not be a good state's juror.*

The prosecutor's response, in context, is that Ms. Straub was struck because she was "very young" and "single," not because she was "female." The words, "very young" and "single" are the focal points of the state's explanation—the operative words that the state used to verbalize why this particular venireperson was struck. Age and marital status are race-neutral, gender-neutral fac-

tors that the state may properly consider when making peremptory strikes. *State v. Smith*, 944 S.W.2d 901, 912 (Mo. banc), *cert. denied*, —— U.S. ——, 118 S.Ct. 377, 139 L.Ed.2d 294 (1997) (age); *State v. Davis*, 936 S.W.2d 838, 841 (Mo.App.1996) (marital status). The point is denied.

### b. Venireperson Moore

Barnett also claims that venireperson Moore was improperly struck because she, too, was female. The prosecutor explained the strike as follows:

> My concern with Ms. Moore is that she never answered any questions at all. There is just – I don't have a lot of information from her. And I don't feel comfortable with her not expressing any opinions or having any responses to questions that were posed. And I am just uncomfortable with the fact that she didn't answer any questions, and I struck her for that reason. She's an unknown person in that group.

A prospective juror's silence, like Ms. Moore's silence in this case, is a permissible, facially neutral explanation for a peremptory strike. *State v. Hughes*, 944 S.W.2d 247, 248 (Mo.App.1997); *State v. Ashley*, 940 S.W.2d 927, 931 (Mo.App.1997); *see also State v. Smulls*, 935 S.W.2d 9, 15 (Mo. banc 1996). The reason is obvious: The state should not be required to take a risk on a prospective juror about whom little information is known.

Nonetheless, Barnett contends that the prosecutor's stated rationale for striking Ms. Moore was merely pretextual because Moore was not silent, as the prosecutor claimed, and in any event, two similarly situated men were not struck. As to Ms. Moore's alleged silence, Barnett correctly points out that she did respond to at least one question. She answered "Yes" when the prosecutor asked if she could sign a death sentence verdict form if she served as the jury's foreperson. Although this lone response was not absolute silence, it still gave only scant indication of Ms. Moore's disposition. Without more information, the prosecutor's strike was justified.

Barnett is also correct that the prosecutor declined to strike two men who had not responded to voir dire questions. While the existence of similarly situated white or male jurors who were not struck is some proof of pretext, it is not dispositive. *State v. Nicklasson,* 967 S.W.2d at 613. On these facts alone, this Court is unwilling to hold that the trial court committed clear error. The point is denied.

### c. Venireperson Gulley

■ The state also challenged venireperson Gulley for cause because she "expressed some concern about being able to impose the death penalty" and because the prosecutor believed that the proceeding was "a bit overwhelming for her." On appeal, Barnett's sole point is that the record refutes that Ms. Gulley "expressed some concern about being able to impose the death penalty." However, this contention, even if true, is a different contention than that Barnett raised in the motion for new trial. There, Barnett's point was that the state's reason for the strike—that Ms. Gulley "worked in education"—was pretensive because the state did not strike a similarly situated venireperson. The point now made was not preserved for appeal and therefore is waived. *State v. Hubert,* 923 S.W.2d 434, 437 (Mo.App. 1996); see *State v. Morrow,* 968 S.W.2d 100, 106 (Mo. banc 1998) ("To preserve an objection to evidence for review, the objection must be specific, and the point raised on appeal must be based upon the same theory.").

### 2. Strike for Cause

■ Barnett next argues that the trial court abused its discretion when it upheld the state's strike for cause of venireperson Darris. The basis of the strike was that Ms. Darris could not consider the death penalty and follow the law. The test for determining whether venirepersons should be excused for cause during the death-qualification phase of voir dire is whether their views would prevent or substantially impair the performance of their duties as jurors in accordance with the instructions and their oath. *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). This Court will not disturb the trial court's ruling on juror qualification matters unless it is clearly against the evidence and amounts to a clear abuse of discretion. *State v. Kinder,* 942 S.W.2d 313, 324 (Mo. banc 1996).

■ During voir dire, Ms. Darris initially indicated that she would not impose the death penalty "[n]o matter what the evidence would show, even after they've made a finding of murder in the first degree ... no matter what the evidence is in the second stage." Later, under questioning by defense counsel, Ms. Darris indicated that she could consider both life imprisonment and the death penalty. However, in response to a follow-up question by the prosecutor,— "[w]ould you really be able to vote for the death penalty if that was what you were presented with?"—she stated, "I don't think so." Given Ms. Darris' initial and final responses, the trial court did not commit a clear abuse of discretion. Point denied.

### III. GUILT PHASE

### 1. Admission of Photograph

Barnett claims that the trial court erred when it admitted into evidence, over a timely objection, an irrelevant and highly prejudicial photograph that contained the word "Jesus." The photograph, state's exhibit 29N, depicted a corner of the victims' bedroom where their dresser was located, and the word "Jesus" appeared on a picture portrait of the victims that hung on a wall adjacent to the dresser. A second photograph, state's exhibit 29O that was not objected to by defense counsel, showed a close-up of the victims' dresser with one of the drawers open. Exhibit 29O did not contain the word "Jesus," but it did show numerous coin wrappers that were scattered inside the open dresser drawer. Exhibit 29N was offered by the state to show the dresser as it was found by the police; exhibit 29O was offered as a close-up of the dresser drawer that the police opened in order to expose the coin wrappers inside the drawer.

■ The rules for admission of such evidence are well settled. If a photograph is relevant, it should not be excluded simply because it may be inflammatory, unless the

situation is so unusual that the photograph's prejudicial effect outweighs its probative value. *State v. Rousan*, 961 S.W.2d at 844. Photographs are relevant if they show the scene of the crime, the identity of the victim, the nature and extent of the wounds, the cause of death, the condition and location of the body, or otherwise constitute proof of an element of the crime or assist the jury in understanding the testimony. *Id.*

■ In this case, the trial judge correctly decided that exhibit 29N was relevant because it helped the jury understand the testimony of Officer Smith, a detective who described the condition of the crime scene and, in particular, the location and condition of the dresser. This evidence linked Barnett to the crime scene and murder by proving circumstantially the source of other coin wrappers that were found in Barnett's coat shortly after the murder. Barnett's argument that exhibit 29O could have shown the location of the coin wrappers without the introduction of exhibit 29N does not make exhibit 29N irrelevant. A photograph is not rendered inadmissible simply because other evidence describes what is shown in the photograph. *Id.*

Barnett also contends that exhibit 29N was far more inflammatory than probative because it would cause the jury to improperly consider the victims' "religious attitudes" during the guilt and penalty phase. Under the circumstances, however, any prejudicial effect was nominal. First, the depiction of the word "Jesus" as a religious symbol was merely incidental because the main focus of the photograph was the dresser in the corner of the victims' bedroom and the word "Jesus" appeared inconspicuously. Second, later in the trial, the jury was made well aware that the victims were religious through other evidence that showed they had attended Sunday school and church the morning of the murders. Point denied.

## 2. Request for Mistrial—Discovery Violation

Barnett next claims that the trial court should have granted defense counsel's request for a mistrial based on the state's use of expert testimony at trial that had not been disclosed during discovery. The controversy came about when the state attempted to prove that Barnett committed the murders with premeditation through the introduction of evidence that he entered the victims' home by climbing onto the outside air conditioning unit and then into the house through the bedroom window. In that regard, the state introduced evidence through an expert witness that a shoeprint on the air conditioner and bloody shoeprints in the victims' home were similar in tread design and pattern to Barnett's shoes. The expert also testified that Barnett's shoes were a new model that was available in the St. Louis area only three days before the victims were killed. This evidence tended to show that the shoeprint had to have been made within that three day time period.

■ Barnett is correct in his contention that the state was obligated to make this information available to him as part of discovery proceedings under Rule 25.03, which requires disclosure of "[a]ny reports or statements of experts, made in connection with the particular case, including ... scientific tests, experiments, or comparisons." However, Barnett waived any objection to the state's lack of disclosure because defense counsel failed to raise an objection to the expert's testimony at the time it was given. The record shows that after the expert testified on direct examination, defense counsel declined to cross-examine him, and the trial court excused him. Another witness was then called, cross-examined, and excused by the court. Defense counsel did not object to the expert's testimony until after the court had returned from its afternoon recess, and only then did defense counsel ask for a mistrial. The trial court properly denied defense counsel's request because failure to object at the earliest opportunity to the admission of evidence or argument of counsel constitutes a waiver of the claim. *State v. Borden*, 605 S.W.2d 88, 90 (Mo. banc 1980). What was said by this Court in *Borden* is equally applicable here:

> The underlying policies requiring contemporaneous objection run contrary to defendant's present claim of error. Timely objection to putative error affords the trial

court an opportunity to invoke remedial measures rather than relegating appellate courts to the imprecise calculus of determining whether prejudice resulted. Moreover, requiring timely objection minimizes the incentive for 'sandbagging,' an improper tactic sometimes employed to build in error for exploitation on appeal should an unfavorable verdict obtain.

*Id.* at 90.

In this case, the objection was not timely because it could have, and should have, been made when the expert testified. The trial court would have been able to take remedial action at that time. Instead, defense counsel delayed an objection until long after the witness had been excused. The point is denied.

### 3. Request for Mistrial—Reference to Joseph Franklin

Barnett argues that the trial court erred when it failed to grant a mistrial after the prosecutor, while questioning a state's witness, referred to Joseph Franklin, a convicted killer. Franklin had been sentenced to death for a murder he committed during an ethnically motivated sniper attack outside a St. Louis County synagogue in 1977. The reference to Franklin was made during the testimony of Officer Nelke, one of the investigators in the case, who stated that he helped take Barnett's confession. On cross-examination, defense counsel elicited from Officer Nelke the fact that Barnett did not confess that he had planned the double homicide. On re-direct examination, the state, apparently intending to prove that most criminals who confess to a crime never admit that they actually planned their crime, asked Officer Nelke, "[a]nd other than someone like Joseph Franklin, if a murder suspect told you they planned to commit murder——." Before the prosecutor could finish the question, defense counsel objected. The trial court sustained the objection and gave a curative instruction to the jury that they were to disregard the question, but refused defense counsel's subsequent request for a mistrial.

■ A mistrial is a drastic remedy reserved for the most extraordinary circumstances, *State v. Clemons,* 946 S.W.2d 206,

217 (Mo. banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997), and a decision whether to grant a mistrial is left to the sound discretion of the trial court. *Id.*

■ Barnett maintains that the prosecutor's reference to Joseph Franklin injected prejudice into the proceeding by diverting the jurors from their duty to decide the case on the evidence alone and by inciting their passion because of Franklin's "infamous notoriety." However, the trial court did not abuse its discretion. The prosecutor's reference to Franklin was very brief, and any prejudice that could possibly have occurred was vitiated by the court's admonition to disregard the question. The point is denied.

### 4. Defining Reasonable Doubt

■ Barnett next contends that the trial court erroneously submitted instructions defining "proof beyond a reasonable doubt" with the words, "firmly convinced." In support, Barnett cites *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), for the proposition that this language violates his rights to due process and constitutes cruel and unusual punishment. This precise claim has been repeatedly and consistently denied by this Court. The phrase "firmly convinced" is essentially synonymous with the phrase "beyond a reasonable doubt." *State v. Hampton,* 959 S.W.2d 444 (Mo. banc 1997); *State v. Owsley,* 959 S.W.2d 789 (Mo. banc 1997); *State v. Hall,* 955 S.W.2d 198 (Mo. banc 1997). Point denied.

### 5. Lesser Included Offenses

■ Barnett also contends that the trial court erred in failing to instruct on the lesser included offenses of felony murder in the second degree and voluntary manslaughter, because there was evidence to support an acquittal of first degree murder and conviction on the lesser offenses. The trial court did, however, submit a conventional second degree murder instruction that sufficiently tested the jury's belief that Barnett had met all the elements for first degree murder. *State v. Smith,* 944 S.W.2d at 918. Because the jury convicted Barnett of first degree murder and rejected the second degree mur-

der submission, there is no reasonable basis to suggest that the jury would not have convicted Barnett of first degree murder had other lesser included offenses been submitted. *Id.* Point denied.

### 6. Improper Reference to Religion

■ Next, Barnett accuses the state of prosecutorial misconduct by making an improper reference to religion during the initial guilt phase argument. The comment about which Barnett complains, was that "Clifford and Leona Barnett had a right to peacefully and sweetly live out their lives on God's terms. They were horribly and brutally murdered on his [Barnett's] terms." Defense counsel, however, did not object to this comment at trial and now asks for plain error review.

■ Relief should rarely be granted on assertions of plain error committed during closing arguments. *State v. Silvey,* 894 S.W.2d 662, 670 (Mo. banc 1995). In this case, there is no indication that the argument resulted in manifest injustice, which is the threshold under Rule 30.20 that must be met before plain error review will be undertaken. The point is denied.

### IV. PENALTY PHASE

### 1. Hearsay Statement

Barnett claims error in the trial court's refusal to allow his former elementary school counselor, Ms. Schuchardt, to testify about a statement Barnett made to her when he was confronted for bringing a small plastic bag of marijuana to school. Ms. Schuchardt was prepared to testify that Barnett told her that the marijuana belonged to his father and that his father smoked marijuana. In response to the prosecutor's hearsay objection, Barnett asserted that the testimony was not offered to prove the truth of the matter asserted, but instead was offered to "explain why Schuchardt considered taking the subsequent action of making a hotline call to report [Barnett's father]." Barnett concludes that the exclusion of Ms. Schuchardt's testimony deprived the jury of crucial evidence of Barnett's "familial problems and his early exposure to illicit drugs."

■ Hearsay statements, or out-of-court statements used to prove the truth of the matter asserted, are generally inadmissible. *State v. Sutherland,* 939 S.W.2d at 376. However, statements that are not offered for the truth of the matter asserted, but rather to explain subsequent actions, are not hearsay. *State v. Simmons,* 955 S.W.2d 729, 737 (Mo. banc 1997).

■ While the statement in this case may well have been admissible if offered solely to explain why Ms. Schuchardt made the hotline call, Barnett has conceded, perhaps inadvertently, that the true reason he sought to have the statement admitted was to prove his "familial problems and his early exposure to drugs." In effect, the truth of the matter asserted in his statement that the marijuana belonged to his father and that his father smoked marijuana, was that he suffered from "familial problems" and an "early exposure to drugs." As such, Barnett's intimation that the evidence was offered to show Ms. Schuchardt's subsequent actions was merely a pretext for admitting inadmissible hearsay. Under these facts, the trial court did not err in refusing to admit the evidence.

■ Furthermore, even if the statement had been admissible, Barnett suffered no prejudice from its exclusion. During the penalty phase, Barnett introduced substantial evidence in mitigation that he had experienced a difficult and troubled childhood and, in particular, that he was exposed to marijuana by his father. Point denied.

### 2. Cross–Examination of Dr. Schultz

Barnett argues that the prosecutor engaged in improper cross-examination of defense psychologist, Dr. Schultz, when the prosecutor asked if her assessment of Barnett was "based on chapter 552 of the Missouri Statutes." This question, Barnett explains, improperly suggested to the jury that his mental health should not be considered in mitigation unless it caused him to be unable to "conform [his] conduct to the requirements of law." This was the legal standard for a defense of mental disease or defect

before the legislature amended chapter 552 in 1993.[2]

■ Barnett had not based his guilt phase defense on a mental disease or defect theory, but instead, had called Dr. Schultz during the penalty phase to offer evidence in mitigation concerning his mental condition. On direct examination, she testified, *inter alia*, that Barnett suffered from major depression, bipolar disorder, and post-traumatic stress disorder. On cross-examination, the prosecutor and Dr. Schultz had the following exchange:

> Q: And you are not saying that David Barnett is suffering from any mental disease or defect which causes him to not be responsible for his actions?
>
> A: I believe that he is responsible for his actions and he has medical defect.
>
> Q: I'm sorry?
>
> A: He does have a medical defect. He has a mental defect. And he is also, it's my opinion, responsible for his actions.
>
> Q: But you did not, your assessment is not based on Chapter 552 of the Missouri Statutes?
>
> [Objection by defense counsel]

Ultimately, the trial judge overruled the defense objection but instructed the prosecutor to refrain from referencing chapter 552.

Having opened the door for the jury's consideration of his mental condition, Barnett cannot now complain about a line of questioning designed simply to prove that Barnett's mental condition did not rise to the level of a full-fledged defense that precluded a finding of guilt. The questioning should have been permitted under the rule that matters within the "fair purview" of the direct examination may be inquired into on cross-examination. *State v. Gray*, 887 S.W.2d 369, 386 (Mo. banc 1994). If anything, this line of questioning, had it been carried out to completion, would have made it clear that Barnett's mental problems were a mitigating circumstance even if they did not constitute a defense to guilt. In any event, Barnett was still able to

make the point that his mental condition was indeed a mitigating factor, and in fact, defense counsel argued strenuously during closing that Barnett's life should be spared because of his mental problems. The point is denied.

### 3. Non–MAI Mitigators

■ Barnett next contends that his state and federal constitutional rights were abridged when the trial court erroneously refused to submit two non-MAI mitigating circumstance instructions in the penalty phase. Barnett's proposed instructions, loosely based on MAI–CR3d 313.44(a), listed eight nonstatutory mitigating factors for the jury's consideration. This Court again rejects this often-raised claim that the listing of nonstatutory factors in mitigation is constitutionally required. *State v. Rousan*, 961 S.W.2d at 849. The point is denied.

### 4. Penalty Phase Argument

■ Barnett contends that the prosecutor impermissibly personalized the argument to the jury by stating that "[Barnett's actions] warrant the imposition of the death penalty. And if those don't, I don't know what does." The prosecutor also exclaimed that "the only just and proper punishment for this case is an imposition of the death sentence." These statements, Barnett explains, turned the prosecutor into "an unsworn witness who asserted facts not in evidence." However, "[a] prosecutor may state his personal opinions on whether the death penalty should be imposed so long as that argument is fairly based on the evidence." *State v. Clemons*, 946 S.W.2d at 231. Here, the prosecutor's argument to impose the death penalty was fairly based on the ample evidence that showed, in particular, the existence of several statutory aggravators. Point denied.

### 5. Exclusion of Defendant's Exhibit R

Barnett alleges that the trial court improperly refused the jury's request to view defen-

---

**2.** Section 552.030.1, RSMo 1994, states that "[a] person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect he was incapable of knowing and appreciating the nature, quality, or wrongfulness of his conduct." This disparity is not relevant to the analysis of Barnett's claim.

dant's exhibit R during the penalty phase deliberations. Exhibit R, a poster board captioned "David Barnett's Developmental History Trauma & Loss," summarized certain aspects of the penalty phase testimony of Barnett's expert witness, Dr. Schultz. Barnett insists that this exhibit was necessary to give the jury a concise, chronological summary of all the painful events in his life that mitigated against a sentence of death. The exhibit had been admitted into evidence during trial and had been referred to repeatedly during closing argument. In refusing the request to view the exhibit, as well as a combined request to view "defendant's prior criminal records," the judge instructed the jury that "[y]ou will be guided by your recollection of the evidence and the instructions the court has given you."

■ The decision to send an exhibit to the jury room during deliberations lies within the sound discretion of the trial court. *State v. Skillicorn,* 944 S.W.2d 877, 896 (Mo. banc), *cert. denied,* — U.S. —, 118 S.Ct. 568, 139 L.Ed.2d 407 (1997). An abuse of discretion occurs only when the trial court's decision to exclude an exhibit from the jury room "was clearly against reason and resulted in an injustice to the defendant." *State v. Roberts,* 948 S.W.2d 577, 596–97 (Mo. banc 1997), *cert. denied,* — U.S. —, 118 S.Ct. 711, 139 L.Ed.2d 652 (1998).

■ In denying the jury's request, the trial judge accurately concluded that exhibit R unduly highlighted certain carefully selected portions of the expert's testimony and, for that reason, was very one-sided. Furthermore, the fact that the jury was required to deliberate on Barnett's penalty solely from their recollection of the evidence and arguments did not work an injustice to Barnett, particularly in light of the fact that the jury had ample opportunity to view his Exhibit R on two separate occasions during the penalty phase. It bears mention as well that the judge refused to send *any* of the exhibits to the jury room, including those exhibits unfavorable to Barnett, such as his prior criminal record. Point denied.

**6. Barnett Family Wishes**

Barnett requests this Court set aside his death sentence because the family of the victims desired that he be sentenced to life imprisonment without the possibility for parole.[3] The family members had written to the trial judge two weeks before Barnett's sentencing asking that the death penalty not be imposed. In support of this claim, Barnett cites article I, section 32.1(2) of the Missouri Constitution, which states that crime victims have, "the right to be informed of and heard at guilty pleas, bail hearings, sentencings, probation revocation hearings, and parole hearings, unless in the determination of the court the interests of justice require otherwise."

■ Article I, section 32.1(2) in no way binds the judge's or jury's determination of punishment. *State v. Jones,* 979 S.W.2d 171, 179 (Mo. banc 1998). The requirements of this provision are fully satisfied by affording victims the opportunity for input at sentencing, and in this case, that opportunity was provided. Moreover, although this provision delineates victims' "rights," it does not give victims the right to dictate the prosecutor's charging decision. Nor does it diminish the basic tenet of the criminal justice system that prosecutions are undertaken and punishments are sought by the state on behalf of the citizens of the state, and not on behalf of particular victims or complaining witnesses. *State v. Eidson,* 701 S.W.2d 549, 554 (Mo. App.1985); *State v. Goree,* 546 S.W.2d 785, 788 (Mo.App.1977); *see also State v. Nangle,* 365 Mo. 134, 276 S.W.2d 135, 137 (Mo.1955). As this Court has observed, "[a] criminal prosecution is a public matter and not a contest between the defendant and his victims, or their relatives." *State v. Reese,* 795 S.W.2d 69, 75 (Mo. banc 1990). Point denied.

## V. CONSTITUTIONALITY OF DEATH PENALTY SCHEME

Barnett claims that the trial court erred in overruling his motion to quash the indictment and to dismiss the case because the Missouri death penalty scheme is unconstitu-

---

**3.** Defendant David Barnett was related to the victims by adoption; John Barnett, the son of the victims, adopted David Barnett when he was eight years old.

tional. He alleges three specific grounds in support of this point, each of which he contends deprived him of his rights to due process and to be free from cruel and unusual punishment.

■ First, he argues that the death penalty scheme is arbitrary because prosecutors have unfettered discretion to seek imposition of the death penalty. This often-raised argument is rejected by this Court once again. *State v. Simmons*, 944 S.W.2d 165, 190–91 (Mo. banc), *cert. denied*, — U.S. —, 118 S.Ct. 376, 139 L.Ed.2d 293 (1997); *State v. Basile*, 942 S.W.2d 342 (Mo. banc), *cert. denied*, — U.S. —, 118 S.Ct. 213, 139 L.Ed.2d 148 (1997). Barnett's twist on the argument—that the prosecutor's decision in this case is all the more arbitrary because it contravenes the wishes of the victim's family—fares no better. As stated in part IV., 6., the decision whether to seek or not to seek imposition of the death penalty is properly undertaken on behalf of the state, not the victims. Point denied.

■ Second, Barnett contends that several aggravating circumstance instructions are vague and duplicative and fail to adequately narrow the class of individuals properly subject to the death penalty. Those instructions include: 1) that the murders were committed while defendant was engaged in committing another unlawful homicide, MAI–CR3d 313.40.2; 2) that the defendant exhibited depravity of mind in committing the murders, MAI–CR3d 313.40.7; and 3) that the murders were committed during the course of a robbery, MAI–CR3d 313.40.11A. This Court again rejects these claims. *State v. Carter*, 955 S.W.2d 548, 558–9 (Mo. banc 1997) (statutory aggravator that the murder of each victim was committed while defendant was engaged in the commission of another unlawful homicide is not unconstitutional); *State v. Smith*, 944 S.W.2d at 920–21 (statutory aggravator that the murder of each victim involved depravity of mind is not unconstitutional); *State v. Ervin*, 835 S.W.2d 905, 925–26 (Mo. banc 1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993) (statutory aggravator that the homicide was committed during the course of a robbery is not unconstitutional); *State v. Butler*, 951 S.W.2d 600, 606 (Mo. banc 1997) (statutory aggravator that the murders were committed for the purpose of receiving money or any other thing of monetary value is not unconstitutional); *State v. Shafer*, 969 S.W.2d 719 (Mo. banc 1998) (robbery and pecuniary gain statutory aggravators are not duplicative). Point denied.

■ Finally, Barnett claims that the scope of this Court's proportionality review is inadequate because the database of capital cases used for comparison includes only those cases in which the death penalty was imposed and excludes those cases in which a life sentence was imposed. This claim, too, has been rejected repeatedly. *State v. Rousan*, 961 S.W.2d at 854–55; *State v. Johnson*, 968 S.W.2d 123 (Mo. banc 1998). Point denied.

## VI. INDEPENDENT REVIEW UNDER SECTION 565.035.3

Under section 565.035.3, RSMo 1994, this Court is required to determine:

1) Whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor;

2) Whether a statutory aggravating circumstance and any other circumstances found by the trier of fact were supported by the evidence; and

3) Whether the sentence is excessive or disproportionate to the punishment imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

Having thoroughly reviewed the record, this Court is satisfied that there is no evidence to suggest that the punishment imposed was a product of passion, prejudice, or any other arbitrary factor.

■ With regard to statutory aggravating circumstances, the jury found: 1) that the murders were committed while the defendant was engaged in the commission of another unlawful homicide, section 565.032.2(2); 2) that the murders were outrageously and wantonly vile, horrible, and inhuman in that they involved depravity of mind, section 565.032.2(7); and 3) that the murders were committed while the defendant was en-

gaged in the perpetration of robbery, section 565.032.2(11). The jury found an additional statutory aggravator concerning the murder of Clifford Barnett—that the murder was committed for the purpose of receiving money or any other thing of monetary value, section 565.032.2(4). From this Court's review of the record, the evidence amply supports the statutory aggravators found by the jury.

■ The imposition of the death penalty in this case is clearly not excessive or disproportionate. The strength of the evidence and the circumstances of the crime far outweigh any mitigating factors in Barnett's favor. Barnett confessed to the crime. He deliberately beat, killed and robbed his grandparents in their own home and, in doing so, showed a callous, deliberate disregard for human life. There are numerous Missouri cases where, as here, the death penalty was imposed on defendants who murdered more than one person. *See, e.g., State v. Johnson,* 968 S.W.2d 123 (Mo. banc 1998); *State v. Clemons,* 946 S.W.2d 206 (Mo. banc 1997); *State v. Ramsey,* 864 S.W.2d 320 (Mo. banc 1993); *State v. Mease,* 842 S.W.2d 98 (Mo. banc 1992); *State v. Hunter,* 840 S.W.2d 850 (Mo. banc 1992); *State v. Ervin,* 835 S.W.2d 905 (Mo. banc 1992); *State v. Powell,* 798 S.W.2d 709 (Mo. banc 1990); *State v. Reese,* 795 S.W.2d 69 (Mo. banc 1990); *State v. Sloan,* 756 S.W.2d 503 (Mo. banc 1988); *State v. Griffin,* 756 S.W.2d 475 (Mo. banc 1988); *State v. Murray,* 744 S.W.2d 762 (Mo. banc 1988); *State v. Young,* 701 S.W.2d 429 (Mo. banc 1985). In addition, a sentence of death has often been imposed when the murder involved acts of brutality and abuse that showed depravity of mind. *See, e.g., State v. Kinder,* 942 S.W.2d 313 (Mo. banc 1996); *State v. McMillin,* 783 S.W.2d 82 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990); *State v. Sidebottom,* 753 S.W.2d 915 (Mo. banc), *cert. denied,* 488 U.S. 975, 109 S.Ct. 515, 102 L.Ed.2d 550 (1988); *State v. Walls,* 744 S.W.2d 791 (Mo. banc), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Lingar,* 726 S.W.2d 728 (Mo. banc 1987); *State v. Roberts,* 709 S.W.2d 857 (Mo. banc 1986). This Court has also upheld death sentences where the defendants preyed upon and killed elderly victims. *See, e.g., State v. Ramsey,* 864 S.W.2d 320 (Mo. banc 1993); *State v. Walls,* 744 S.W.2d 791 (Mo. banc 1988); *State v. Mathenia,* 702 S.W.2d 840 (Mo. banc 1986); *State v. Battle,* 661 S.W.2d 487 (Mo. banc 1983). The circumstances of this case are well within those in numerous other cases in which the death penalty has been imposed.

Barnett's specific claim that his "traumatic developmental history" and "mental impairments" render his sentence disproportionate fails to take into account the overwhelming strength of the evidence and the horrible circumstances of the crime. In addition, Barnett ignores other non-statutory aggravating factors such as his criminal record of five prior felony convictions: three for forgery, one for burglary, and one for stealing. Furthermore, Barnett's claim discounts the state's vigorous impeachment of the expert witness who testified about his psychological condition. In particular, the state introduced evidence that a different psychologist, who had originally been engaged by the public defender to evaluate Barnett, wrote a report stating that Barnett suffered only from a mere conduct disorder rather than depression. Cases in which this Court has rejected similar claims include: *State v. Brooks,* 960 S.W.2d 479 (Mo. banc 1997) (death sentence not excessive or disproportionate despite abuse, neglect, and trauma suffered as a child); *State v. Richardson,* 923 S.W.2d 301 (Mo. banc 1996) (defendant's claim that his low mental capacity rendered proportionality review unconstitutional was rejected). Point denied.

## VII. CONCLUSION

The judgment is affirmed.

All concur.